Good morning, your honors. My name is Dan Hoytink. I've been appointed in this case to represent the Egberto family. The Egberto's consist of Mr. Egberto, a father, Mrs. Egberto, a mother, and Ms. Smith, a daughter. Mr. Egberto is in prison in the state of Nevada where he's been for roughly 30 years and he's going to be there for life without parole for murder. The Egberto family has not been allowed to visit within the prison for now going on almost eight and a half years. Before this Court now is a motion to dismiss and an appeal of an order granting a motion for summary judgment in favor of the defendants. And I appreciate the opportunity for an oral argument to clarify a few points in this pretty unusual case. In counsel, if Judge Gould, if I could ask you a question. Absolutely, your honor. Do you have preserved and pending a request for injunctive relief? I do not believe there is preserved and pending a request for injunctive relief, your honor. That was as there's been no motion filed and there's been no application for injunctive relief. So as I understand it, we're here on the summary judgment which is solely on the damages claim under 1983? As I understand it, they're also a declaration they're asking for declaratory relief as well from the judge to stop this from happening and to get an order saying that their visitation cannot continue to be permanently banned. And we're, that really relates, that's a backhanded way of answering a different question than Judge Gould asks, but a related one because that's basically an equitable approach. Where is the relief for declaratory judgment preserved? I believe it was reserved in the complaint and it was asked for in the motion below. But what is appealed from? The appeal, what is appealed from is the motion, the order granting the motion for summary judgment, which is my understanding addressed both the ongoing claim to stop the injunctive relief and the declaratory judgment request to stop what's happening here and to prevent it from happening again. They've also sought individual damages as well. So that is also on the table. Your honor. So I guess my question in light of your comments is, does your appeal preserve a challenge to the denial of the declaratory relief in the summary judgment? We believe it does, Your Honor, yes. Your Honor, where do you stand in trying to get access to Natalie and other, well, the daughter? As I recall from the defendants, they say, well, just apply, you know, apply. And that would be a State remedy that might solve your problem if it were realistic. Your Honor, one of the problems with that position and the position that the State has taken in the motion to dismiss is they've invited them to come back and apply. But the problem is, is on the record there's evidence that this is absolutely futile. In the record you'll see evidence from the warden and then the then-director using terms like your visitation rights are permanently terminated. Ms. Egberto sent a letter to the then-director of the NDOC asking for a review and the review was denied with a statement in writing saying this matter will not be revisited. So it begs the question, Your Honor, particularly on a motion for summary judgment as to what the scope of this ban is. And putting on the summary judgment goggles, viewing the evidence in a light most favorable to the Egberto's, this absolutely is a permanent ban. And we take the position, Your Honor, that an invitation to reapply to visit is pointless at this point because they've been told not to apply and that this thing is not going to be reviewed and it's not going to be revisited. And I understand a part of at some point she offered to come in with complete physical, you know, lack of access through a glass, et cetera, correct? That's exactly right, Your Honor. Simply to be able to see the individual. And that's exactly right. And that's one of the things that distinguishes this unique case from many of the other cases you see both in the Supreme Court and the Ninth Circuit and district courts. You see a lot of visitations, and I believe the lead case, Overton, said, you know, that dealt with a limited ban for a limited amount of time. You see other cases saying you don't have a constitutional right to a contact visit when you're offered a noncontact visit, but that's not the case here. What you have here is a complete personal ban of visitation. Now, they are allowed to call each other on the phone and write each other letters and that type of thing, but, Your Honors, they would submit that that's not an adequate substitute. Now, underlying all of this, though, when you're talking about the scope of the ban is the fact question as to the reason of the ban. And the reason of the ban relates back to an October 19, 2005 visit. There was a six-hour contact visit that day between Mrs. Efferto. This is really a stupid question. Everybody talks about it. Well, I'm sure it's not a stupid question, Your Honor. No, it really is. Everybody talks about contact visits like I'm supposed to know what a contact visit is, but I don't. Can you tell me quickly? I would actually punt that to Mr. Leslie, but my understanding of it is, is there's not going to be a wall of glass between us. I don't think it means you may be able to reach across the table and hold hands. I have no idea. But as I understand it, there's just not a separation. As I envision it, if you've seen the TV show Arrested Development, I picture the two of them sitting across from each other and a guard yelling, no touching. We might want to stick to the record on that. I think you could take judicial notice of that fabulous show. But your – so that – on that day, there was a contact visit for six hours between Mrs. Egberto and Mr. Egberto. Following that visit, Mr. Egberto went back to his cell, and they found him having overdosed on – apparently overdosed on heroin. They searched his cell. They found a handcuff key, a three-and-a-half-inch folding pocket knife, and a fair amount of drug paraphernalia. Now, the State jumped to the conclusion that this came from Mrs. Egberto, and they presented evidence of why they think that's so. But there's a problem with that. And the problem is that there's a lot of evidence cutting against it being Mrs. Egberto. Among them, the visit was supervised by one, if not two, guards the entire time. Now, I can't tell you for the record how big the room was, but we know there were one or two guards there. After the visit was over, Mr. Egberto was subject to an unclothed body search. And make no mistake about it, this was an intrusive search. But so they were wrong. What's your best case, though, to say that any decision they would make under these circumstances would violate clearly established law? What's your best case? The best case is that's an atypical and unordinary ban. And the reason being is because if you look at page 9 of the motion to dismiss, because of mootness, and if you look at there's a footnote, and I'll get you the page number when I sit down, and the district court's order is saying if this was a permanent ban, this would have violated AR 719, which is an administrative regulation relating to visitation. And what the statement is. You know, I do these cases, try them, you know, and we always tell people it's not whether or not, it's not whether they violate State law, it's whether they violate Federal law. And here you're talking the constitutional principle. What is your best case? Well, the reason is, is that's what makes it atypical and unordinary, is because this is not something that's permitted. It is not something that's allowed. No, but the question under 1983 is whether there was clearly established Federal law that the warden and his various assistants violated in issuing this. That's what we have to decide under 1983. And backing that up. You can sue them in State court if you want to pursue some kind of administrative violation, but what is the established Federal case we look at so that they would have known, oops, I badmouthed this. Well, you would look at Overton, which made the reference that the Court might reconsider a ban if it was permanent, now it was dicta. That's right, and you've stated it accurately, might reconsider, but it hasn't. That's the point. That's the point. You have to establish, you have to have clearly established Federal law. Well, the other, Overton doesn't establish it. As a matter of fact, Overton goes against the plaintiff, but it says, well, if the facts were different, maybe we would decide differently. And that's what Dunby-Castro says the same thing. Dunby-Castro says the same thing. It might be a different conclusion if there were a blanket ban, which is true. It might be, but has it yet become a different conclusion in the law so that we can charge these State individuals with violence? Well, the law would say you can't impose an atypical and an ordinary ban on someone, and as we understand it, with respect to the liberty interest. The law also says is that some First Amendment right to association survives. Right. Survives incarceration. When you say the law, counsel, you say the law does this or that. I have the same question to Judge Quist. What's your Federal case that says the law says? The standard for the atypical and ordinary ban would be Chappell, which is a 2013 case we cited in our brief. I can also get you the citation to that in the page I set up. And I see I have 30 seconds, so I'd like to reserve that. Thank you, Your Honor. I'll reserve your remaining time. Are you going to give her another chance to apply for these contact visits, or even noncontact visits? Not only will we, but we have. Judge Gould, Judge McKeown, Judge Quist, good morning. My name is Clark Leslie. I'm a senior deputy attorney general from the Attorney General's Office of the State of Nevada. It's my privilege to represent the defendants in this case. Judge Quist, first you asked what is contact versus noncontact visit, and my honorable opponent described it fairly well. Contact visits are where they are. That's why they call it reality TV, I guess. And he's right. Arrested develop, it's not bad. But you come into a room and you sit at a table where your family is on one side of the table and the inmate is on the other. They have rules. You can touch each other. You're allowed one hug, things of that nature. You have to be dressed appropriately. But there is contact, and there is the ability potentially to pass things between each other. A noncontact visit is where there is a point of last between the inmate and the visitors. They either speak on a phone or over a speaker. There is an inability to touch one another. In response to your question, Judge Quist, in our motion to dismiss on the basis of mootness, and I would like to talk about how this case has morphed over the years, Warden Baker has expressly in her affidavit declared and promised the following. And keep in mind, this is no longer a permanent ban case because since 2011, Mr. Edberto has had over 11 visitors. As warden, I will continue to allow for Edberto to visit the identified individuals he wishes to receive as visitors. And she goes on to state how they need to be qualified. And then she concludes, and this is paragraph 10, the docket entry 41-3. She states, and I quote, this would include Natalie Edberto who does not have a current valid application for visitation privileges here at Ely State Prison. We have allowed numerous members of Mr. Edberto's family to visit him on the simple request that they fill out an application. Now, my esteemed colleague and opponent says, well, it would be a futile act. It will not be a futile act, and there's a very important reason why she needs to reapply again. Visitors have to meet minimum qualifications, and there are things they cannot be. For example, they cannot be a person that has been convicted of a felony. Nor, for example, can they be an individual who has a communicable disease. And we don't know what Mrs. Edberto's status has been from the year 2005 until today. All she has to do is reapply. And Warden Baker has verified and affirmed under penalty of perjury that if she meets the criteria, she will be permitted to visit, which leads to a broader question, and that is how this case has changed. When the pleadings were filed and when the opposition and the motion for summary judgment was filed, certainly this was a permanent ban case. But even then, that was an overexpression. It was not a permanent ban necessarily as to everyone in the universe. It was a permanent ban as to Natalie Smith, against whom there was an overwhelming amount of admittedly circumstantial evidence that placed her as the person that brought the contraband to the prison. Nonetheless, she might and probably will, and in this case she has been promised, the ability to visit again. My esteemed opponent has brought to the attention of the Court two other inmates that also were caught with contraband, and he says this is a violation of equal protection. They get to see visitors, but Mr. Edberto doesn't. Besides the fact that there are a number of differences, this stresses the fact that after a period of time of non-misconduct, inmates can re-qualify for the visitation privilege. Even those individuals, they try to use it as an excuse or example for a violation of equal protection, is actually a good example for the system working, which is another important point. You have seen the overwhelming evidence of this individual's misconduct over 20-plus years of being incarcerated. Nothing worked. Not administrative segregation, not disciplinary segregation, not other forms of extreme forms, although they are permitted under the Constitution of incarceration, not a withdrawal of virtually every privilege an inmate has. Nothing worked. He was the type of inmate that we tried to get out of the environment by sending him to California. After six years, they said we can't deal with this guy. Nevada, take him back. He stayed with us for a while, and in the meantime, he induced another woman, Laura Husky, to smuggle in methamphetamines to him. We tried a second time to remove him from the Nevada environment, and we sent him to Wyoming. After six years in Wyoming, they said we can't deal with this guy. Take him back. He has violated virtually every major disciplinary rule in the history and in the books of the Nevada Department of Corrections. Nothing worked until he was told that he was going to be receiving a permanent ban on visitation. And for the first time in his incarceration history, he did not violate a major disciplinary rule for over two years. At that point, the new director of the Nevada Department of Corrections, together with Warden LeGrand at Lovelock Correctional Center and Warden Baker at Ely State Prison, which is our maximum security prison, decided they would give him another break. And since that time, as I've mentioned, he has had 11 visitors. The specter of a permanent ban works, although we don't have that here. I have a lot of people looking over my shoulder from other prisons that are saying, don't, please ask the Court not to take this disciplinary opportunity that we have with extremely misconducting inmates away from our possibility, subject to due process, of course, subject to access to the courts. Let me ask a question. Assuming that this Court, and I don't know what they're going to say, what we are going to say, says that there's no clearly established Federal law that was violated here, are you saying that the State of Nevada would maintain its same position of allowing her to apply and apply the rules that you've just described to us, or would you take the position, well, we won, there's no clearly established law, you know, let's just crank it up on him again? Absolutely not. As Warden Well, I gave you two opportunities. As Warden Baker has affirmed, if he applies, if she applies and she qualifies, she will get the visitation, whether we win, lose, or have a draw here. Let's, there's, there's three parts to the case. A fourth one is what's going to happen afterwards. And on that point, I suggest that following this argument, since you won't yet have a decision, that the two of you ought to talk and resolve the forward-looking application and the Warden's promise made to this Court that it will be considered in due course and fairly. But, number one, the, there is a case for damages pending here, and the question is, is there qualified immunity, because there's no clearly established Federal law, and we understand your argument on that, that there is not. Okay. The second is whether there is an injunction pending, which I think all of us judges had a question. And my understanding is that your esteemed co-counsel has said there's no injunction on appeal. Is that your understanding? That is my understanding. So now there's a third part, and that is declaratory judgment. Was that argued and disposed of in the summary judgment, and is that on appeal to us? I don't believe it, it was directly addressed by the district court in its excellent order that granted summary judgment. However, its effect is to declare, as this Court has mentioned, that there is, there was no established law at the time that a reasonable State actor would look at and say, okay, if I do this or I do that, I'm going to be in violation of the law, because there was no case that said you couldn't have permanent ban. Right. But the declaratory judgment is a little different, because that's not, that would not expose the State individuals to any personal damages, and they're not, this is against the State qua State, which I assume the declaratory judgment would be that this practice, they would want a declaration from this Court that this practice is unconstitutional. Now, assuming that's even on appeal, what is your response to that? This is not unconstitutional. Robertson and Overton said that this is within the discretion of prisons. A Macedon case stated that a restriction of visitation is not a typical conduct. Kentucky v. Thompson said the denial of visitation is well within the terms contemplated by a prison sentence. And in the Robertson case, very similar to this one, they stated that an expectation of a belief of visitation is not sufficient to give rise to a liberty interest. So we believe that all of the established law would state, and I see my time is up, that declaratory relief is not necessary to change, ban, alter, or affect any of the existing laws. Thank you. Your Honors, thank you. Your Honors, very quickly, the footnote I referenced is page 17, footnote 18. The footnote 18 of the district court's order, the Chappelle case I referenced, is cited on page 30 of our briefing. Your Honors, if I may raise one more thing, the visitations to other people are not at issue. What's at issue is there was a specific permanent ban for a wife and a daughter for this prisoner. The second thing, Your Honor, before I run out of time, is all the cases about bans have some sort of purpose rationally relating to why there was a ban. Here there's a fact question that the ban ever was justified at all because of the reasons that may or may not have occurred. Well, he got stoned right afterwards. I mean, he left it and he's stoned. Now, maybe they don't have proof beyond a reasonable doubt that she brought it in, but nonetheless, as soon as he has a contact visit with her, he's absolutely stoned. He's passed out in his cell. He wasn't punished with a visiting violation. ER-6869 is a disciplinary report. He was given disciplinary segregation, which is not defined as a visitation ban. If you look at its extensive disciplinary history from pages 207 to 212, you will see there's not a visitation ban. There's one visitation ban on December 24, 2008 for 12 months, and we would concede to you for during those 12 months, neither Natalie Smith nor Sarah Smith could visit Mr. Egberto. I'm out of time. Thank you, Your Honors. Thank you. I would like to thank both counsel for their arguments this morning. The case of Egberto v. McDaniel is submitted.
judges: Quist, McKeown, Gould